OPINION OF THE COURT
 

 GREENBERG, Circuit Judge.
 

 I. INTRODUCTION
 

 This matter comes on before this Court on appeal from an order of the District Court entered on March 31, 2009, affirming March 18, 2008 and June 9, 2008 orders of the Bankruptcy Court in proceedings arising from the sale of a major asset of the Debtors’ estate in this bankruptcy proceeding. The Bankruptcy Court denied the request of an unsuccessful bidder for the asset, Kelson Channelview LLC (“Kelson”), for disbursement of administrative expenses in the form of a break-up fee from the estate in the March 18, 2008 order, and then in the June 9, 2008 order approved the sale of the asset to Fortistar, LLC.
 
 [1]
 
 Kelson appealed but the District Court affirmed the orders of the Bankruptcy Court.
 
 In re Reliant Energy Channelview LP,
 
 403 B.R. 308 (D.Del.2009). We will affirm the order of the District Court and, in effect, the order of the Bankruptcy Court of March 18, 2008.
 

 II.BACKGROUND
 

 The Debtors in the Chapter 11 proceedings, Reliant Energy Channelview LP and Reliant Energy Services Channelview LLC (together, the “Debtors”), decided to sell their largest asset, a power plant in Channelview, Texas.
 
 [2]
 
 With the assistance of consultants with expertise in the energy industry, the Debtors contacted 115 potentially interested purchasers. This substantial effort was fruitful for 38 potential bidders executed confidentiality agreements with respect to a possible purchase, and 24 went further and conducted due diligence on the purchase. Ultimately 12, including Fortistar, made bids for the plant. Many of the bids, however, were contingent on the bidder obtaining financing, a difficult undertaking in the then
 
 *203
 
 prevailing business environment. Kelson, however, submitted a complete bid of $468 million not contingent on financing and was selected as the winning bidder. Consequently, Kelson entered into an Asset Purchase Agreement (“APA”) with the Debtors for the power plant.
 

 Inasmuch as the Debtors were in bankruptcy, consummation of the APA required the Bankruptcy Court’s approval. Consequently, the APA provided that the Debtors immediately would seek an order from the Bankruptcy Court allowing the sale. Moreover, the Debtors agreed that they would seek an order approving certain “bid protections and procedures” for Kel-son’s benefit if the Court determined that there should be an auction for the plant before its sale. These proposed bid protections and procedures provided that Debtors could not accept a competing bid unless it exceeded Kelson’s bid by $5 million. Furthermore, the proposed bid protections and procedures provided that if a competing bid was accepted, Kelson would be entitled to a $15 million break-up fee, about three percent of its bid, as well as reimbursement for expenses it incurred in the sale process up to $2 million. The practice of paying a break-up fee to an initial bidder for assets has developed in bankruptcy and other contexts to compensate the bidder for memorializing its interest in acquiring the asset, an interest which sometimes, as we will explain below, can be useful to the asset’s seller even if the bid is not accepted.
 

 As the APA required, the Debtors requested that the Bankruptcy Court authorize the sale of the plant to Kelson without conducting an auction. In that motion, the Debtors asserted that the Kel-son bid “represents the highest and best offer available for the Debtors’ assets and that further marketing of the assets will not result in a higher purchase price.” App. at 198. The Bankruptcy Court delayed its decision on this motion when one of the Debtors’ equity holders objected to the fast pace of the transaction.
 
 [3]
 
 Ultimately, however, the Court would not approve the sale to Kelson without an auction for the plant.
 

 When the Court delayed the approval of the sale, the Debtors, with the support of their Creditors, asked the Court to authorize the bid protection measures that we have described. However, Fortistar, which previously had submitted a losing contingent bid, objected to this request and asserted that it was willing to enter a “higher and better” bid at an auction, but the $15 million break-up fee along with the $2 million reimbursement for expenses would be a deterrent to it doing so.
 

 The Bankruptcy Court held a hearing to consider authorization of the bid protections at which, among others, William Har-die, the consultant to the Debtors in charge of shopping the assets, and Andrew Johannensen, an officer of the Debtors, testified. Hardie described the process the Debtors had followed in seeking a buyer and explained that the Debtors dropped Fortistar from consideration as a purchaser when it lost its financing. At that point, the Debtors and their creditors decided to sign the APA with Kelson as its consummation would result in the full compensation of all the Debtors’ creditors, and Kel-son’s bid was for a fair price and was financed fully.
 

 Hardie thought that by reason of all the work that had been done in seeking bid
 
 *204
 
 ders there was no need for an auction as the Debtors already had obtained the best price for the plant. Moreover, Hardie explained that in view of the advantages of the Kelson bid the Debtors were willing to seek the bid protections Kelson sought and he believed that Kelson would not have agreed to make its bid unless the Debtors agreed to seek the bid protections. Finally, Hardie thought that the Kelson APA benefitted the Debtor’s estate because it established a floor price and terms for the sale of the assets. On cross-examination Hardie acknowledged, however, that Kel-son would be bound by its offer even if the Court rejected the bid protections, though he suggested that Kelson would find a way to avoid its commitment if it desired to do so.
 
 [4]
 
 Johannensen’s testimony was similar to that of Hardie.
 

 The Bankruptcy Court nevertheless declined to approve the sale of the plant without an auction and, in a ruling from the bench, said that in deciding whether to approve the bid protections it had to consider whether they would enhance or chill bidding. In particular, the Court believed that it was required to decide whether the proposed protections would benefit the estate:
 

 It’s hard generally to consider how bid protections or break-up fees protect the estate. I’ve heard the arguments and have approved them in the case where the ... parties have convinced me that it is the only way to get other bidders, any bidder to the table. But I’m not convinced in this case that that is the case. There are other bidders, at least one other bidder. And I have in the past denied break-up fees in circumstances where another party had appeared and expressed an intention to bid at the auction.
 
 [5]
 

 App. at 589.
 

 Ultimately the Bankruptcy Court entered its March 18, 2008 order approving the $5 million “overbid” requirement which required that bids competing with Kelson’s bid must exceed it by $5 million. In addition, the Court approved the reimbursement to Kelson for expenses it incurred in the transaction up to $2 million. Finally, however, in the provision of its order at issue on this appeal, the Court refused to authorize payment of the $15 million break-up fee.
 

 Kelson did not participate in the subsequent auction, and, in fact, argued that its offer was no longer available. Fortistar, however, submitted the winning, now fully financed bid, which topped Kelson’s bid by $32 million. In accordance with the Bankruptcy Court’s decision, the Debtors did not pay Kelson the $15 million break-up fee, although they did pay Kelson for its expenses.
 
 [6]
 

 After the Bankruptcy Court entered an order on June 9, 2008, approving the sale to Fortistar, Kelson appealed to the District Court from the order denying the payment of the $15 million break-up fee, arguing that the Bankruptcy Court abused its discretion by denying Kelson’s request for the fee. Kelson also argued that it was a stalking-horse bidder entitled to a break
 
 *205
 
 up fee as a matter of fundamental fairness and contended that the Debtors were es-topped from opposing its appeal because they supported its request for the breakup fee in the Bankruptcy Court. The District Court rejected Kelson’s arguments and affirmed the March 18, 2008 and June 9, 2008 orders of the Bankruptcy Court and thus the District Court did not allow the payment of the break-up fee. Kelson then filed this appeal of the District Court’s order to the extent that it affirmed the Bankruptcy Court’s order of March 18, 2008.
 

 III. JURISDICTION AND STANDARD OF REVIEW
 

 The Bankruptcy Court had initial jurisdiction over the matter now before us as it concerned the administration of the estate. 28 U.S.C. § 157(b). The District Court had jurisdiction to review Kelson’s appeal under 28 U.S.C. § 158(a),
 
 [7]
 
 and we have jurisdiction to review the District Court’s final decision under 28 U.S.C. § 158(d)(1).
 

 We exercise plenary review over the decision of the District Court sitting as an appellate court in this bankruptcy proceeding and consequently we review the ruling of the Bankruptcy Court.
 
 See Lowenschuss v. Resorts Int’l, Inc. (In re Resorts Int’l, Inc.),
 
 181 F.3d 505, 509 (3d Cir.1999). We review the Bankruptcy Court’s legal determinations
 
 de novo,
 
 its factual determinations for clear error, and its decision denying the break-up fee on an abuse of discretion standard.
 
 See Interface Group-Nevada, Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.),
 
 145 F.3d 124, 131 (3d Cir.1998).
 
 [8]
 

 IV. DISCUSSION
 

 A. The
 
 O’Brien
 
 Standard
 

 In
 
 Calpine Corp. v. O’Brien Env’t Energy, Inc. (In re O’Brien Env’t Energy, Inc.),
 
 181 F.3d 527 (3d Cir.1999)
 
 (“O’Brien”),
 
 we set forth the controlling legal principles applicable on this appeal. In
 
 O’Brien,
 
 the debtor, after considering bids from several interested buyers for certain of its assets, entered into an asset purchase agreement with Calpine Corporation, which conditioned its bid on the parties’ ability to secure Bankruptcy Court approval of a $2 million break-up fee. The debtor, supported by many of its creditors, sought approval for the fee from the Bankruptcy Court. Nevertheless, the Court denied the application, stating that a breakup fee would complicate or even chill the bidding process. However, the Court gave Calpine permission to renew its application after an auction for the sale of the assets.
 

 Notwithstanding Calpine’s insistence that it would not make an offer without the assurance of a provision for a break-up fee, it did enter the bidding process. After a different bidder made the best offer, Cal-pine renewed its request for a break-up fee, but the Court denied the request after an evidentiary hearing. Calpine appealed and, after the District Court affirmed, Cal-pine appealed to our Court.
 

 Calpine argued to us that it was seeking the fee under “applicable case law,” but we
 
 *206
 
 rejected this contention. We held that courts do not have the authority to create new ways to authorize the payment of fees from a bankruptcy estate, and the methods of recovering fees from an estate are limited to the procedures established by the Bankruptcy Code. We concluded that a bidder must seek a break-up fee under 11 U.S.C. § 503(b), which, so far as germane here, permits payment of post-petition administrative expenses for the “actual, necessary costs and expenses of preserving the estate.” We also held that there was no “compelling justification for treating an application for a break-up fee and expenses under § 503(b) differently from other applications for administrative expenses under the same provision.”
 
 O’Brien,
 
 181 F.3d at 535.
 

 Therefore, we indicated that in considering requests for break-up fees, we would apply the general standard used for all administrative expenses — “the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party’s ability to show that the fees were actually necessary to preserve the value of the estate.”
 
 Id.
 
 Focusing specifically on break-up fees, we noted that it was permissible to offer a break-up fee and reimbursement for expenses to induce an initial bid, provided the allowance of the fee does not give an advantage to a favored purchaser over other bidders by increasing the cost of acquisition. We also indicated that a break-up fee is not “necessary to preserve the value of the estate” when the bidder would have bid even without the break-up fee.
 
 Id.
 
 (citing Bruce A. Markell,
 
 The Case Against Breakup Fees in Bankruptcy,
 
 66 Am. Bankr.L.J. 349, 359 (1992)).
 

 Applying this standard to the facts in
 
 O’Brien,
 
 we found that Calpine would have made its bid even without the assurance of a break-up fee, as it indeed did. For this reason, among others, we found that an award of a break-up fee was not necessary to preserve the value of the estate and we affirmed the order of the District Court and thus the order of the Bankruptcy Court denying allowance of the fee.
 

 B. Application of
 
 O’Brien
 
 To This Case
 

 Under
 
 O’Brien,
 
 we must decide whether an award of a break-up fee was necessary to preserve the value of the Debtors’ estate. In this regard, we recognize that it could be argued that in either or both of two ways a break-up fee could have preserved the value of the estate. First, the opportunity to obtain a break-up fee could have induced Kelson to make its bid before the Bankruptcy Court ordered the auction, and second, the provision for a break-up fee may have been necessary to induce Kelson to adhere to its bid after the Court ordered the conducting of the auction.
 
 [9]
 

 1. Was a break-up fee needed to induce the first bid?
 

 Kelson’s bid undoubtedly provided a benefit to the estate by establishing a min
 
 *207
 
 imum price and a complete set of offer terms and, in fact, the Bankruptcy Court required that any competing bid exceed Kelson’s bid by at least $5 million. Indeed, it is plausible to believe that an initial bid, ordinarily or perhaps even always, will provide a benefit to an estate because it will establish a floor price for the assets to be sold. But we have to decide a different question, i.e., was an award of a break-up fee necessary to produce this benefit and preserve the value of the estate?
 

 We recognize that the first bidder in a bankruptcy sale necessarily takes a risk at least to the extent of investing the time, money and energy needed to produce its bid.
 
 [10]
 
 Nevertheless, while we understand that the first bidder may be motivated in part to submit its bid by the possibility that it will receive a break-up fee, it does not follow from that motivation that the bidder will withdraw its bid, pass up on the opportunity to acquire the asset to be sold, and nullify its work in preparing its bid if a court, when ordering that there be an auction of assets, declines to authorize a break-up fee to be paid to the initial bidder. Surely
 
 O’Brien
 
 makes that clear because even though Calpine had made its bid contingent on the award of a break-up fee, it competed at the auction after the Bankruptcy Court rejected the request for a break-up fee.
 

 Here, however, Kelson argues that the provision of a break-up fee was necessary to entice it to bid, but the facts do not support this argument. We are satisfied that it is clear beyond doubt that Kelson did not condition its bid on the presence of a provision for a break-up fee, although it did condition the bid on the Debtors’ promise to seek authority to pay it such a fee. Thus, section 8.1(d) of the APA provided that “Sellers shall ... file a bidding procedures motion with the Bankruptcy Court ...
 
 seeking
 
 the entry of an order approving the bid protections.” App. at 288 (emphasis added). These bid protections included the break-up fee. Accordingly, there is no escape from the fact that Kelson
 
 did
 
 make its bid without the assurance of a break-up fee, and this fact destroys Kelson’s argument that the fee was needed to induce it to bid.
 
 [11]
 
 Rather, the mere possibility of the payment of a breakup fee was sufficient for that purpose.
 

 2. Was a break-up fee needed to preserve Kelson’s bid?
 

 The record suggests that although an assurance of a break-up fee may not have been needed to induce Kelson’s bid, it nevertheless could have been useful to assure that Kelson adhered to its bid rather than abandoning its attempt to purchase the plant in the event that the Bankruptcy Court required an auction for its sale. A break-up fee certainly provides a benefit to
 
 *208
 
 an estate if a bidder remains committed to a purchase, though, as we have explained, we see no reason to believe that bidders who already have made a full and complete bid necessarily will abandon their efforts to obtain an asset without an assurance of a break-up fee. In this case, the Bankruptcy Court believed that the provision for the fee would deter other possible purchasers from bidding for the plant and would outweigh any possible benefit achieved for the estate by keeping Kelson committed to the purchase through the provision for the break-up fee.
 

 Clearly, the Bankruptcy Court was faced with a difficult choice. If the Court denied the break-up fee, then Kelson might abandon the purchase, as it supposedly did. If another suitable bid had not materialized and Kelson had walked away permanently from the purchase, the estate would have been harmed severely by the denial of a break-up fee. To avoid this result, the Court could have granted a break-up fee to secure Kelson’s existing bid. Nevertheless, the Court decided that a $15 million break-up fee was not necessary for the protection of the estate. This decision, which we view from the Court’s perspective on March 18, 2008, was justified by (1) Fortistar’s assertion that it planned to continue bidding, (2) the binding language of the APA, and (3) the logical belief that Kelson would not abandon a fully negotiated agreement if no other bidder materialized. Though we do not decide the case on the basis of our knowledge of what happened after the Court denied the fee, as we decide the case on the basis of the record as of March 18, 2008, when the order from which Kelson appealed to the District Court was entered, there is no escape from the fact that the Bankruptcy Court’s decision was shown to be correct when Fortistar placed a substantially higher bid for the assets.
 

 3. Conclusion
 

 We cannot say that the Bankruptcy Court abused its discretion in its application of the
 
 O’Brien
 
 standard. Though the allowance of a break-up fee might have benefitted the estate, Kelson made its bid before the auction knowing that it might not receive a break-up fee, and a retroactive grant of a break-up fee could not have induced a bid that Kelson already had made. Though, as we have made clear, the estate might have benefitted if on March 18, 2008, the Bankruptcy Court had provided for a break-up fee to secure Kel-son’s adherence to its earlier bid, the Court found that the potential harm to the estate that a break-up fee would cause by deterring other bidders from entering the bid process outweighed that benefit. We cannot say that the Bankruptcy Court abused its discretion in reaching its result.
 

 C. Application of the Business Judgment Rule Instead of
 
 O’Brien
 

 Kelson bases a substantial portion of its argument on the circumstance that none of the Debtors’ creditors or equity holders objected to its request for a break-up fee. Kelson points out that the business judgment rule would have been applied to the Debtors’ decision to support the award of a break-up fee if the Debtors had not been in bankruptcy. We agree that the Bankruptcy Court should not lightly dismiss such a consensus among the creditors, but we are not willing to conclude that the presence of unanimity among creditors should require the Court to decide the matter through the application of the business judgment rule. Clearly, section 503(b) does not give the Bankruptcy Court the authority to award fees solely because there is no objection to them from a party-in-interest. That section requires that for fees to be awarded they must be part of “the actual, necessary
 
 *209
 
 costs and expenses of preserving the estate,” and does not suggest that that standard is met merely because there is no objection to the application for the fees.
 
 [12]
 
 Furthermore, the role of the business judgment rule is of limited use on this appeal because in
 
 O’Brien
 
 we stated that “we conclude that the business judgment rule should not be applied as such in the bankruptcy context.” 181 F.3d at 535.
 
 [13]
 

 In declining to apply the business judgment rule we have not overlooked Kelson’s contention that we should not consider
 
 O’Brien’s
 
 rejection of the business judgment rule to be controlling in this case for the Debtors are solvent and the “sole affected shareholder has consented to the fee.” Appellant’s br. at 14-15 n. 2. We reject the contention that
 
 O’Brien
 
 should not apply because, in providing the circumstances in which a court may award fees, section 503(b) does not make a distinction depending on the solvency of the debtor. We cannot rewrite that section to accommodate Kelson.
 

 D. Kelson’s “Fundamental Fairness” and Estoppel Arguments
 

 In the District Court, Kelson argued for the first time that it was entitled to a break-up fee as a matter of “fundamental fairness,” which Kelson interprets as a type of unjust enrichment claim.
 
 [14]
 
 But Kelson did not raise this claim in the Bankruptcy Court, and we will not consider new claims for the first time on appeal.
 
 Singleton v. Wulff,
 
 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). We are aware that Kelson argues that it did raise its break-up fee claim in Bankruptcy Court and that it is simply asserting a different basis for the same claim.
 
 See Yee v. City of Escondido,
 
 503 U.S. 519, 534-37, 112 S.Ct. 1522, 1532-33, 118 L.Ed.2d 153 (1992) (permitting new argument in support of same claim). But we disagree with its view of the record for a break-up fee under section 503(b) is clearly a statutory claim, and a claim for a breakup fee as a matter of “fundamental fairness” is a claim that can be predicated only on the common law or a principle of equity. These statutory and common law or equitable claims, though seeking the same relief, are discrete, rather than being different arguments advancing the same claim.
 
 See B & T Masonry Constr. Co. v. Pub. Ser. Mut. Ins. Co.,
 
 382 F.3d 36, 40-41 (1st Cir.2004) (same distinction addressed).
 

 Kelson also argues that the Debtors are estopped from opposing its appeal because they supported the request for a break-up fee in Bankruptcy Court.
 
 *210
 
 But debtors-in-possession have a fiduciary duty to maximize the value of the estate,
 
 Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,
 
 330 F.3d 548, 573 (3d Cir.2003), and the Debtors here argue convincingly that if they adhered to their earlier position in the face of the changed circumstances they would harm the estate and violate their fiduciary duty. Overall, we are satisfied that the Debtors’ opposition to Kelson’s appeal is not unconscionable, does not undermine the integrity of the judicial system, and is not made in bad faith. Therefore, we reject Kelson’s estoppel arguments. In any event, even if we disregarded the Debtor’s arguments and entertained Kelson’s appeal on an
 
 ex parte
 
 basis, we would reach the same result that we reach today.
 
 See supra
 
 note 12.
 

 V. CONCLUSION
 

 The Bankruptcy Court did not abuse its discretion when it concluded that an award of a break-up fee was not necessary to preserve the value of the estate and accordingly, we will affirm the District Court’s order of March 31, 2009, to the extent that it affirmed the order of the Bankruptcy Court of March 18, 2008, denying authorization to pay the break-up fee.
 

 [1]
 

 . The actual purchaser was Fortistar’s affiliate GIM Channelview Corporation LLC, but for ease of reference we will refer to the purchaser as Fortistar.
 

 [2]
 

 . In its brief Kelson characterizes the sale as being of "substantially all of the Debtors' assets.” Appellant’s br. at 2.
 

 [3]
 

 . The objector's claimed status as an equity holder was disputed at the time but we are not concerned with that dispute. We emphasize, however, that not all of the interested parties supported the original proposed sale, and the Bankruptcy Court, we think quite appropriately, acted with caution in considering this very substantial matter.
 

 [4]
 

 . Of course, the text of the APA and not Hardie’s opinion of its meaning governs its construction and interpretation and the parties' obligations under it.
 

 [5]
 

 . Kelson argues that this last sentence created a
 
 per se
 
 rule that break-up fees are not available when there is another bidder, but we do not believe that the Bankruptcy Court was applying any such rule. Rather, we understand the experienced Court merely to be saying that as a factual matter break-up fees often are not needed when there are bidders for an asset other than the initial bidder.
 

 [6]
 

 .There was an agreement that Kelson’s expenses were $1,210,257.
 

 [7]
 

 . In their brief Debtors contend that Kelson did not appeal to the District Court from the June 9, 2008 order approving the sale. Nevertheless, as we have indicated, the District Court affirmed both the March 18, 2008 and June 9, 2008 orders. The disputed scope of the District Court’s purely appellate jurisdiction, however, is not significant to us because Kelson asks only that we "issue an order granting [it] full payment” of the break-up fee, appellant’s br. at 33, a matter over which the District Court had jurisdiction and on which it ruled, and over which we now have jurisdiction. Accordingly, we do not address any other issue.
 

 [8]
 

 . There are no disputes of what may be characterized as the historical facts in this case.
 

 [9]
 

 . In its brief Kelson argues that the “APA was necessary to preserve the value of the estate, as it enabled the Debtors to resolve a dispute with the pre-petition secured lenders with respect to the use of cash collateral.” Appellant’s br. at 19. While we do not doubt that a sale to Kelson would have resolved the cash collateral dispute inasmuch as all the Debtors’ creditors were to be paid in full from the sale proceeds, the issue before us is quite different from the need to placate the Debtors' creditors, as we are concerned with whether the $15 million break-up fee was necessary to preserve the value of the estate, a matter relating to Kelson’s bid rather than to the consequences of a sale of the plant such as the satisfaction of the Debtor’s creditors. As we explain below, Kelson entered into the APA without the assurance that it would receive a break-up fee if it was unable to acquire the plant.
 

 [10]
 

 . In this case, Kelson was compensated fully for its first-bid expenses when the Bankruptcy Court awarded it $1,210,257 for that purpose.
 

 [11]
 

 . In its brief Kelson asserts that "the Debtors improperly claim that they only had an obligation to file a motion seeking approval of the Bid Protections and the Break-Up Fee. According to the Debtors, this means that the Break-up Fee was always 'unnecessary,' thus making this contractual obligation illusory.” Appellant’s br. at 5. Kelson argues that under New York law which controls the interpretation of the APA "a contract cannot be interpreted to create an illusory obligation.”
 
 Id.
 
 We reject this argument because there was nothing illusory about the Debtors’ obligation to seek authority for a break-up fee as they did. Kelson knew or should have known that the Debtors could urge the Bankruptcy Court to allow the fee but they could not command it to do so. Thus, Kelson’s contention in its brief that the "Debtors were required to
 
 obtain
 
 approval [of] the Break-Up Fee, as a condition to Kelson's bid,”
 
 id.
 
 at 25 (emphasis added), is plainly wrong.
 

 [12]
 

 . Recently in
 
 McKenna v. Philadelphia,
 
 582 F.3d 447, 459 n. 13 (3d Cir.2009), in considering an application for attorney’s fees, we pointed out that “it should not be overlooked that the awarding of an attorney's fee is a judicial action and, regardless of the parties’ indifference to it, a court need not lend its imprimatur to an inappropriate order merely because there was no objection to its entry.” The same principle applies to a request for administrative expenses in the form of a break-up fee under section 503(b).
 

 [13]
 

 . We hasten to note that our comment in
 
 O'Brien
 
 about the applicability of the business judgment rule in a bankruptcy case was limited to the circumstance of a party seeking an alternative to section 503(b) as a basis for awarding expenses from the bankruptcy estate. We could not have meant then, and do not mean now, that the business judgment rule is irrelevant when a corporate governance dispute arises in a bankruptcy setting. Indeed, more recently, in an adversary action brought in connection with a bankruptcy and in which a plaintiff challenged the actions of corporate fiduciaries, we recognized that the plaintiff was required to "plead around the business judgment rule.”
 
 In re Tower Air, Inc.,
 
 416 F.3d 229, 238 (3d Cir.2005).
 

 [14]
 

 .In its brief Kelson elevates its fundamental fairness argument to the level of being a "doctrine.”