In re ASARCO LLC, et al., Debtors.

Bankruptcy No. 05–21207.
Civil No. 2:09–cv–194.

United States District Court,
S.D. Texas,
Corpus Christi Division.

Aug. 20, 2010.

Charles A Beckham, Jr., Christopher L. Castillo, Haynes and Boone, LLP, Houston, TX, Trey Andrew Monsour, Haynes & Boone LLP, Dallas, TX, for Appellant.

Jacob Lee Newton, Peter C. D'Apice, Sander L. Esserman, Stutzman Bromberg, et al., Dallas, TX, John H. Tate, II, Debra L. Innocenti, Raymond W. Battaglia, Oppenheimer Blend, et al., San Antonio, TX, Henry J. Kaim, King & Spalding LLP, Houston, TX, Robert J. Rosenberg, Latham & Watkins, William J. Roll, III, Douglas Paul Bartner, Randall L. Martin, Shearman & Sterling LLP, Richard Mark Seltzer, Cohen Weiss Simon LLP, New York, NY, Derek J. Baker, Reed Smith, et al., Philadelphia, PA, Paul M. Singer, Reed Smith LLP, Pittsburgh, PA, Eric D. Albert, Alan S. Tenenbaum, US Dept. of Justice, Washington, DC, Charles R. Sterbach, Office of the US Trustee, Corpus Christi, TX, for Appellee.

Eric J. Taube, Hohmann Taube, et al., Austin, TX, for Respondent.

## MEMORANDUM OPINION AND ORDER

ANDREW S. HANEN, District Judge.

ASARCO Incorporated and Americas Mining Corporation (together, the "Parent") have appealed the Bankruptcy Court's Order Approving the Expense Reimbursement in Connection with the Auction and Proposed Sale of the SCC Judgment (the "Reimbursement Order"), arguing that the Bankruptcy Court applied the wrong standard in evaluating the Debtor's Motion for an Order Approving the Expense Reimbursement in Connection with the Auction and Proposed Sale of the SCC Judgment (the "Reimbursement Motion") and that the Reimbursement Order is contrary to the proper legal standard. (Doc. Nos.3, 25.) The Reimbursement Order authorized the Debtor, subject to vetting procedures set out in the order, to reimburse certain bidders who participated in the auction of the SCC Judgment. (*See* R. 15.) Having considered the briefs and oral arguments of the parties, and for the reasons set forth below, the Court hereby AFFIRMS the Reimbursement Order.

1. The SCC judgment refers to this Court's entry of judgment in *ASARCO LLC v. Americas Mining Corp.* (*ASARCO III*), Civil Action No. 1:07–cv–018 (S.D. Tex. Apr. 15, 2009) (Doc. No. 508).

2. The Trust would have been created as contemplated by the Debtor's proposed plan unless the Debtor could fully liquidate the SCC Judgment. (*See* R. 1 at ¶¶ 8–9.)

3. The SCC judgment has been repeatedly characterized as an exceptionally complex and unique asset. (*E.g.,* R. 24 at 38:23–24 (Bankruptcy Judge noting that "[t]his is the most difficult asset that I have had to value, if I have to value it, in my 23 years as a

## I. Background

### A. The Bankruptcy Case and the SCC Judgment

This appeal arises out of an arduous, but successful bankruptcy reorganization proceeding. Ultimately, two plans of reorganization were submitted for consideration by the Bankruptcy Court and this Court—one filed by the Parent and one filed by the Debtor. Each plan provided for a unique disposition of the SCC Judgment, a substantial asset of the Debtor.[1] The Parent's proposed plan essentially excused the Parent from its obligations under the SCC Judgment, but in exchange provided a significant infusion of cash from the Parent so as to satisfy the various creditors' claims. A key element of the Debtor's proposed plan, however, was its use of the SCC Judgment to pay some of the creditors' claims. The proposed plan contemplated the creation of a trust that would liquidate the SCC Judgment. Upon liquidation of its legal claims, the trust would distribute proceeds to various creditors holding interests in the trust.[2]

Before one can truly grasp the issues in this appeal, it is critical to have an understanding of how the SCC Judgment itself was reached.[3] The full background can be found in this Court's prior opinions,[4] but

judge."); R. 25 at ¶ 13 (George Mack Proffer indicating that "unlike most acquisitions, the sale of all or a portion of the SCC Judgment has an unusual component—the due diligence necessary to learn more about the asset is highly legal in nature, forcing potential purchasers to incur substantial legal expenses before they can submit a Binding Proposal."))

4. *See ASARCO LLC v. Americas Mining Corp.* (*ASARCO II*), 404 B.R. 150 (S.D.Tex.2009) (Doc. No. 507) (amended opinion and order on damages); *ASARCO LLC v. Americas Mining Corp.* (*ASARCO I*), 396 B.R. 278 (S.D.Tex. 2008) (opinion and order on liability). The facts summarized in this section are from both opinions.

for the purposes of this opinion, the Court will provide a brief summary.

It begins with a mining company. AS-ARCO[5] was primarily a mining concern, and one of the primary products from its mining operations was copper. ASARCO possessed large copper ore reserves in the United States, as well as Chile and Peru. It had longstanding business relations with Grupo Mexico, S.A.B. de C.V. ("Grupo"), a Mexican corporation that was also involved in the mining industry. When Grupo decided to expand its mining concerns, AS-ARCO was one of two companies that caught its eye. In its 1999 accelerated acquisition of ASARCO, Grupo financed the purchase in part by negotiating a $817 million loan from Chase Manhattan Bank and Chase Securities Inc. Once the acquisition was complete, the $817 million debt was transferred to ASARCO. Combined with ASARCO's pre-existing debt, it was saddled with a total long-term debt of $1,767 billion.

On top of the substantial long-term debt, ASARCO was also responsible for a $450 million revolving credit facility that was secured by ASARCO's assets, including 43,348,949 shares of Class A Common Stock that ASARCO held in Southern Peru Copper Company ("SCC"), representing a controlling (54.18%) interest. These particular shares were special "Founder's Shares" with enhanced voting rights.

According to certain governing provisions of the stock, the super-voting rights of any shares that were transferred to a party that was not an affiliate would be terminated. Grupo's concern was that if it pledged the SCC shares directly as collateral for the credit revolver, it would trigger the loss of the super-voting rights. Grupo thus implemented a restructuring in which it created Southern Peru Holding Company ("SPHC"), a totally owned subsidiary of ASARCO (and thus an affiliate) which would hold the SCC shares. Then, ASARCO pledged the SPHC stock as collateral. Grupo also formed AMC as a holding company for its mining interests and transferred all of its ASARCO stock to AMC. The result was a structure in which Grupo wholly owned AMC, which wholly owned ASARCO, which wholly owned SPHC, which owned the stock in SCC.

In addition to the debt it acquired from the 1999 leveraged buy-out, ASARCO was beset with legal troubles arising from environmental and asbestos claims, and the strain on ASARCO's finances began to take its toll. By the fall of 2001, ASARCO technically defaulted on the credit revolver, fell behind on its payments to critical vendors, and lacked the $50 million necessary to pay a bond debt that had become due. As a result of low copper prices, which languished at less than a dollar per pound (and were about 60 cents per pound in November 2001), ASARCO's sales volume and profit were not sufficient to cover its tremendous debt. The financial troubles continued through 2002: in January, ASARCO stopped paying various creditors and contractors, and it could not even pay the experts that it had retained to help it through its cash crisis. With limited options available to attempt to right the ship and mounting pressures from creditors (notably the head bank in the credit revolver threatening to foreclose on the security interests, including the SCC stock),

---

5. ASARCO LLC was the Debtor in this bankruptcy proceeding. Although ASARCO LLC was earlier organized under the name ASAR-CO Incorporated (prior to its acquisition by Grupo), that corporation is distinct from the ASARCO Incorporated that joins Americas Mining Corporation as the Appellant. In this opinion, the Debtor will be referred to simply as "ASARCO," and its corporate parent as the "Parent."

especially with the low price of copper at the time, AMC and Grupo decided that their best option was to sell ASARCO's most valuable asset, its SCC shares.

Not wanting to lose control of the SCC shares, Grupo's aim was to transfer them to AMC in a manner that would avoid a fraudulent conveyance action. Despite this aim, neither AMC/Grupo/ASARCO nor any third party marketed the SCC stock in a public fashion, nor solicited or sought third-party offers. Ultimately, the shares were transferred to AMC on March 31, 2003, in exchange for $672,653,400, most of which was distributed to various creditors. SPHC received a $123.25 million note from AMC, and ASARCO/SPHC also received forgiveness of a $41.75 million note that they owed to AMC and the Larrea family.[6]

Despite the sale, ASARCO continued to have financial difficulties. While it was able to pay off some of its debts (including the revolver and $100 million of bonds that had come due) with the proceeds from the sale of the SCC stock, it did not have sufficient cash flow to make payroll, fund its mining operations, or cover its growing liabilities from environmental and asbestos-related litigation. In August 2005, ASARCO reluctantly filed for Chapter 11 bankruptcy. The fraudulent transfer suit was later filed by ASARCO and SPHC against AMC.

Following a four-week bench trial, this Court found in pertinent part that: (1) AMC was liable for actual intent fraudulent transfer under Delaware law because it entered into the SCC transfer "with full knowledge that ASARCO's creditors would be hindered or delayed as a result"; (2) pursuant to New Jersey and Delaware law, AMC was liable for aiding and abetting the ASARCO directors' breach of fiduciary duty to ASARCO's creditors; and (3) that

AMC was liable under Arizona law for conspiracy with one or more of ASARCO's directors to fraudulently transfer the SCC stock.

After the parties failed to successfully mediate on the issue of damages, this Court issued an opinion on damages and judgment which ordered the return of all stock traceable to the 54.18% of SCC shares that were owned by SPHC and/or ASARCO on March 30, 2003, the day before the transfer took place. It also ordered that AMC pay damages in the amount of dividends that were awarded from March 31, 2003 through the date of the return of the stock. AMC was granted an offset in the amount of consideration that it originally paid for the stock. Ultimately, in the SCC Judgment this Court awarded the Debtor 260,093,694 shares of Southern Peru Copper Company common stock and $1,382,307,216.75 in cash plus post-judgment interest (to account for the dividends and prejudgment interest, less the offset of consideration that AMC paid for the stock), based on this Court's findings of liability and damages entered in two prior orders. *See ASARCO III.* AMC perfected its appeal from this judgment and was avidly pursuing this appeal at the time the Bankruptcy Court approved the auction process that is at the heart of the dispute in this appeal.

Suffice it to say, the SCC Judgment was the result of complex findings by this Court, and the bulk of its worth lay in the shares of SCC stock rather than the cash damages (which were essentially proceeds—dividends—from ownership of the stock). Ascertaining the value of the SCC Judgment required one to consider several variables, none of which were easy or simple. First, there are the legal findings

---

**6.** The Larrea family owns a controlling interest in Grupo and German Larrea is the Chairman of the Board and Chief Executive Officer of Grupo.

that form the basis for the SCC Judgment. There being no precedent in the Fifth Circuit to govern the issues decided in the case, this Court was compelled to rely on the law of three different states to decide the liability issues alone. Many of these issues had not been resolved by the jurisprudence of the applicable states. Should the Fifth Circuit conclude that the liability determinations were in error and reverse the findings that AMC was liable for actual fraudulent transfer, aiding and abetting ASARCO's breach of fiduciary duty, and conspiracy, the SCC Judgment could be worth nothing.

Second, as was made apparent throughout the fraudulent transfer trial as well as the confirmation proceedings, the price of copper significantly affects the value of the SCC stock and has the potential to wreak havoc similar to the way that it affected ASARCO's balance sheet and value. Further, the price of copper is subject to wild and unpredictable fluctuations. For example, the price of copper rose from less than a dollar per pound around the time that ASARCO experienced its greatest financial woes (1999 to 2004), to more than $3.50 per pound in 2008. Although prices fell with the economic recession in early 2009 to about $1.25 per pound, by the time of the confirmation trial (August 2009), prices were back up to nearly $3 per pound, a significant increase from the time that ASARCO was pushed into bankruptcy (in part by its inability to profit due to low copper prices). The increased price of copper is one of the primary reasons that the Bankruptcy proceeding was ultimately successful—with higher prices, ASARCO's operations returned to profitability and it again became a prized company. Nevertheless, the fluctuation of copper prices

was another variable which a prospective buyer faced.

Third, evaluating Southern Peru Copper Company itself was another challenge. Although the SCC Judgment is for more than 260 million shares of SCC stock (representing all of the shares owned by AMC at the time of the judgment), that is not a controlling share in the company. Thus a potential acquirer of the SCC Judgment would have to consider how much it would be worth to own a significant, but nevertheless minority interest in the company, taking into account that it would not necessarily have the ability to alter SCC's internal management and operations. Furthermore, since the company is not domestically based, a potential acquirer would also have to determine and account for any potential costs of doing business in Peru—including, for instance, political or social stability issues that could arise. Finally, these shares were Founder's Shares with special voting privileges, but they were also subject to special restrictions on the ability to transfer them to third parties. The overall effect of these restrictions was not totally clear.[7]

Thus, while on the one hand the SCC Judgment ultimately represented a potentially highly valuable asset, it was not an easy asset to value.

## B. Auction of the SCC Judgment

Given the novelty of the legal issues decided in the underlying case, the fluctuations in the price of copper and the overall uncertainty in the copper industry, itself, and the uncertainties inherent in investing as a minority owner in a foreign business, it could not be taken for granted that the Debtor would easily be able to recover the

---

7. The Debtor, among others, argued that these transfer restrictions did not survive bankruptcy. The Parent argued to the contrary. Ultimately, this issue never had to be tested, but it is without dispute that neither position was obviously conclusive.

full face value of the SCC Judgment. Moreover, given the pending appeal there was certainly a chance that the judgment had no market value whatsoever. At the time in question, neither Sterlite nor the Parent had proposed full value plans. The SCC Judgment was clearly going to be the key to any successful consummation. The Debtor needed to monetize or find some other way to get value for the SCC Judgment aspect of its confirmation plan in order to provide creditors with more certainty of cash payments (as opposed to speculative trust holdings) immediately on the effective date of confirmation. These concerns prompted the Debtor to pursue an auction of the SCC Judgment prior to confirmation. (R. 1.)

The Debtor asked its financial advisors, Barclays Capital Inc., to assist in the auction process. (R. 5.) Initially, the Debtor introduced the auction concept formally by seeking permission to pay Barclays more fees and expand Barclays' original retention agreement to include the auction process. (R. 1.) The Debtor was not able to obtain Bankruptcy Court approval for such expansion, most notably due to the Parent's argument that Barclays had already been retained and paid for the purposes of selling the estate's assets and that this judgment was one of the assets.[8] Consequently, the Parent contended that no additional compensation should be due. Eventually, Barclays agreed to provide the auction-related services and "reserve[ ] its rights regarding compensation therefor." (R. 5 at ¶ 4 n. 2.)

As outlined in the Debtor's Reimbursement Motion, the auction involved "a two-part bid solicitation process, subject to a topping auction," which was "intended to induce parties to submit their highest and best bid at the outset of the process, create a level playing field, and maximize value for the benefit of ASARCO and its estate." (R. 5 at ¶ 5.) First, Barclays prepared informational materials that it sent to "more than 100 potential parties who Barclays believed were interested in acquiring all or a portion of the SCC Judgment." (*Id.*) These parties "primarily included hedge funds and private equity and institutional investors." (*Id.*) [9] The initial potential parties were provided with an introductory letter and teaser. Those that expressed an interest in learning more received an information memorandum and were invited to join a virtual data room. Then, certain parties were also given the more detailed "indication of interest process letter." (*Id.*; the letter is also attached to R. 5.)

Potential bidders were invited to submit preliminary, non-binding "written indication[s] of interest for a full or partial purchase of the SCC Judgment ... by July 16, 2009." (*Id.*) Those who submitted such "Indicative Offers" were the "Initial Bidders." (*Id.*) After reviewing the Indicative Offers and consulting with its advisors, the Debtor "decided to invite a select group of Initial Bidders to proceed to the second phase of the process." (*Id.*) In the second phase, this select group of "Qualified Bidders"—all of whom were believed "to have the financial wherewithal to complete the potential transaction"—would be given the opportunity to conduct additional diligence. (*Id.*) It is for these Qualified Bid-

---

8. Somewhat inconsistently, the Parent has now argued before this Court that Barclays did not have permission to conduct the auction.

9. There was at the time, at least one other investor group, comprised of Harbinger Capi-

tal Partners Master Fund I Ltd. and Citigroup Global Markets, Inc., that had shown interest in actually acquiring the Debtor. As the actual confirmation process proceeded, it eventually dropped out.

ders that the Debtor sought the approval of expense reimbursements.

At the time the Debtor filed the Reimbursement Motion, the auction process was under way but not yet concluded. The additional steps that were contemplated were (1) after the second period of due diligence and beginning the week of August 3, 2009, Qualified Bidders would be invited to make binding proposals and (2) the "Independent Committee" of the AS-ARCO board of directors, "after consultation with its advisors and the key creditor constituents," would analyze and evaluate the binding proposals to decide "whether to enter into a stalking-horse purchase agreement with one or more of the Qualified Bidders." (*Id.* at ¶ 6.) Then, (3) if the Independent Committee decided to enter into a stalking-horse purchase agreement, it would submit a motion to the Bankruptcy Court seeking approval of the agreement. (*Id.*) If such an agreement were approved, (4) a topping auction would be held wherein ASARCO, again after consulting with advisors and key creditor constituents, would determine the bid "providing the highest and best value" for the bankruptcy estate. (*Id.*) At the topping auction, ASARCO would have been able to discuss terms of any bid with other bidders and "allow one or more other bidders to make higher and better offers." (*Id.*)

The Bankruptcy Court approved the Expense Reimbursement Order, but the SCC Judgment was not ultimately sold. According to the record, four of the initial bidders were invited to participate in the second phase of due diligence. (R. 23 at

¶ 62.) Two binding bids were submitted— one on August 13, 2009 and one on August 14, 2009. (*Id.*) There is nothing in the record to indicate how much further the Debtor intended or sought to pursue the auction process, but it bears noting that contemporaneously with the binding bid submission, the Debtor was in the middle of the confirmation trial.[10] Since the prevailing plan was that offered by the Parent—which includes AMC who was the judgment debtor—the Parent in effect by confirmation bought the judgment against it. This eventual result, however, was far from predictable at the time of the auction.

### C. Expense Reimbursement for Qualified Bidders

The rationale for seeking reimbursement of expenses was to provide an incentive for bidders to pursue the diligence and expend the resources necessary to bid on the SCC Judgment. (R. 11 at 22–23.) Given the uniqueness of the asset, the Debtor anticipated that potential bidders would have to invest significant resources to evaluate the complex legal issues and financing considerations that would be required before such bidders could make their "highest and best offer[s]." (R. 5 at ¶¶ 8, 22.) This would be expensive and the bidders would have to do this facing the prospect that they might not be the successful bidder, or that even if they were the highest bidder, the judgment still might not be sold. When faced with the prospect of such a large expense plus the possibility of no return, Qualified Bidders would understandably be reluctant to par-

---

**10.** The record contains statements by Debtor's counsel, indicating that the Debtor was still pursuing the auction process by negotiating with the Qualified Bidders that had submitted binding bids, with the ultimate goal of a potential stalking horse agreement, as late as August 17, 2009, which was the fifth day of the two-week confirmation trial. (R. 24 at

35:3–15) (Kinzie commenting that there was "an ongoing auction;" and stating that at that point, they had received the binding bids and "are in the process of negotiating with prospective bidders right now towards a stalking horse motion that we may or may not file in the near future. . . .")

ticipate.[11] Indeed, several interested parties had explicitly requested diligence and work fees, and these requests (redacted for confidentiality purposes) were disclosed to the Parent. (R. 25 at ¶ 15 (Barclays representative noting that "[a] majority of the Initial Bidders will undertake the necessary due diligence only if some of their expenses are reimbursed."); R. 17 at 17:14–18; *see also* R. 26.) Thus, the Debtor sought to reduce some of the burden of making a bid by providing for limited reimbursement of documented expenses. (R. 25 at ¶¶ 13–15, 17.)

The proposed expense reimbursement process set a cap on the total allowed reimbursements, which would be drawn from a specially-designated Expense Reimbursement Fund. (R. 5 at ¶ 13.) After determining the appropriate amount of reimbursement, but before distributing any funds, the Debtor would first notify the "Notice Parties"—the Asbestos Committee, Future Claims Representative, Department of Justice, ASARCO Committee, and United States Trustee.[12] (*Id.* at ¶ 16; R. 17 at 18:22–24.) The Notice Parties would have twenty-four hours to file an objection if they believed the proposed amount was "not within the best interests" of the Debtor. (R. 5 at ¶ 17.) An objection would automatically stay distribution of reimbursement funds unless the Debtor

first obtained an order from the Bankruptcy Court or reached an agreement with the objecting party. (*Id.*)

In the Bankruptcy Court's Expense Reimbursement Order ultimately approving the Reimbursement Motion, the Bankruptcy Court also required that the Debtor notify the Bankruptcy Court, along with the Notice Parties, of the amount of any proposed reimbursement before distribution of funds. (*Id.*) Should the Bankruptcy Court determine a hearing to be necessary on the amount of an Expense Reimbursement, it would have twenty-four hours to set an emergency hearing *sua sponte*. (*Id.* at ¶ 4.) Absent objection by a Notice Party or a hearing ordered by the Bankruptcy Court, the Debtor would have the authority to distribute the reimbursement. (*Id.* at ¶ 8.)

### D. Procedural History of the Expense Reimbursement Order and Appeal

The Reimbursement Order was entered, over the objection of the Parent, on July 29, 2009. (R. 15.) Prior to entering the Reimbursement Order, the Bankruptcy Court heard argument in three different hearings (R. 11, 13, 17), and received the proffer of George Mack, a Managing Director at Barclays. (R. 25.) Mr. Mack's proffer emphasized the unusual nature of

---

**11.** Indeed, as counsel for the ASARCO Committee made clear at the first hearing on the Reimbursement Motion, the rights of the interested parties (creditor committees, future claims representative, asbestos and environmental litigation claimants, and presumably also the Parent) to object to any *sale* motion were reserved. (R. 44:17). Thus the significant amount of time that would be necessary to evaluate the SCC Judgment, the opportunity cost of the Qualified Bidders in terms of the resources they could have been spending for some other purpose, and the risk that even the best bid would not be sufficient to acquire the SCC Judgment, were all potential barriers to the success of the auction.

**12.** One constant bone of contention was that the Parent, being the entity that was potentially most affected by the SCC Judgment, was not ultimately granted status as a "Notice Party." At least one of the Debtor's concerns was that if the Parent were given access to details of the bids and reimbursement requests and the ability to object, it would present the appearance that the Parent had an advantage over other potential bidders, or it would give the Parent the ability to unduly disrupt the process, and thus discourage bidders from making their best offers. (*See* R. 17 at 19:5–14; R. 13 at 9:19–12:12.)

the SCC Judgment, which would necessitate that any potential purchasers "incur substantial legal expenses" in order to evaluate it, and he stated his opinion that "the Expense Reimbursement will encourage bidders to submit their highest and best offer as part of the auction process, thereby maximizing the value of the SCC Judgment." (*Id.* at ¶¶ 13–14.) At the hearing held on the day before the entry of the Reimbursement Order, the Bankruptcy Judge commented that relative to the amount of the SCC Judgment, "the amounts that are being considered are actually ... small in comparison." (R. 17 at 127:1–3.) He further noted that:

the creditors committee and all of those parties that are involved with this ... including even the U.S. Trustee are not opposed to this proposal and if [the Debtor] want[s] to risk those dollars to try to monetize this judgment, I think there are lots of problems associated with it, but I think they ought to be allowed to have some freedom to move forward to negotiate some fees.

(*Id.* at 127:4–10.)

In its order approving the Reimbursement Motion, the Bankruptcy Court found that reimbursement of all or a portion of the Qualified Bidders' actual, documented due diligence expenses and, in some cases, the payment of work fees, in connection with the auction and potential sale of the SCC Judgment, is "fair, reasonable, and appropriate and is designed to maximize the value of ASARCO's estate." (R. 15 at ¶ C.) It further found that ASARCO had "demonstrated a compelling and sound business justification for the Expense Reimbursement under the circumstances, timing, and procedures set forth in the

Motion." (*Id.*) Concluding that "[t]he entry of this Order is in the best interests of ASARCO and its estate, creditors, interest holders, stakeholders, and all other parties in interest," the Bankruptcy Court granted the Reimbursement Motion. (*Id.* at ¶ D.)

The Parent filed a Notice of Appeal on August 5, 2009. (R. 18.) On August 12, the Bankruptcy Court entered an order staying the Expense Reimbursement Order, effective from August 11, 2009 at 2:30 p.m. through August 31, 2009. (R. 22.) On September 2, 2009, the Bankruptcy Court extended the stay through September 30, 2009. (Doc. No. 25 at 11; *see also* Bk. Doc. No. 12773.)[13] This Court granted a temporary stay, effective November 20, 2009, pending briefing on the Parent's Emergency Stay Motion. (Doc. No. 8.) On December 15, 2009, this Court denied the Emergency Stay Motion. (Doc. No. 13.)

On November 13, 2009, this Court entered the Memorandum Opinion, Order of Confirmation, and Injunction, in which it affirmed the selection of the Parent's plan of reorganization for confirmation over that of the Debtor. (Supplemental R. 30.) Pursuant to its plan of reorganization, the Parent gained control over the Debtor (in this case, the Appellee) and the SCC Judgment, which could have mooted the appeal and left the Reimbursement Order's beneficiaries in limbo. After the effective date of the Parent's plan, however, Elliot Management and the Baupost Group (the "Intervenors") jointly filed a Motion to Intervene. (Doc. No. 16.) The Intervenors applied as "the beneficiaries" of, and incurred fees "as a result of and in reliance on" the Expense Reimbursement Order before the initial stay of the Order. (*Id.*)[14]

---

**13.** Citations to the Bankruptcy Docket refer to Bankruptcy Case No. 05–21207.

**14.** In addition to granting the Expense Reimbursement Order, the Bankruptcy Court also

ordered the sealing of several documents, including those with information regarding the cap on the Expense Reimbursement Fund, those containing the identities of the initial

This Court granted that motion. (Doc. No. 17.)

On June 24, 2010, following the completion of briefing by both sides, this Court held a hearing at which counsel for the Parent and the Intervenors appeared.

## II. Standard of Review

This Court reviews the Bankruptcy Court's findings of fact for clear error. *Bass v. Denney (In re Bass)*, 171 F.3d 1016, 1021 (5th Cir.1999). That is, the Court will only reverse the Bankruptcy Court's findings of fact "if left with the definite and firm conviction that a mistake has been committed." *Perry v. Dearing (In re Perry)*, 345 F.3d 303, 309 (5th Cir. 2003) (internal citations omitted). The Bankruptcy Court's conclusions of law, mixed questions of fact and law, and questions concerning the application of law to the facts, are reviewed *de novo*. *In re Bass*, 171 F.3d at 1021.

## III. Discussion

The Parent has challenged both the legal standard applied by the Bankruptcy Court when it evaluated the Reimbursement Motion and the Reimbursement Motion as evaluated under what it contends to be the "proper" legal standard. (Doc. No. 25.) Specifically, it argues that the business-judgment standard under 11 U.S.C. § 363(b) should not have been used to evaluate the Reimbursement Motion, and that the Bankruptcy Court should have used the more rigorous § 503(b) administrative expense standard. (*Id.*) Under the

administrative expense standard, the Parent contends that the Reimbursement Motion could not have been granted because the record does not support a finding that it was "actually necessary to preserve the value of the estate." (*Id.*) The Intervenors argue that application of the business judgment standard was appropriate, and that the Expense Reimbursement Order would pass muster even if the "administrative expense" standard were applied. (Doc. No. 30.) The Intervenors also argue that this appeal is equitably moot. (*Id.*)

### A. Competing Legal Standards

 Section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate...." 11 U.S.C. § 363(b)(1). Approval of § 363(b) transactions requires that the bankruptcy court find that the debtor "justify[ ] the proposed transaction. That is, for the debtor-in-possession ... to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir.1986) (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)).

 Section 503 of the Bankruptcy Code allows parties to recover administra-

bidders, and those with information regarding the reimbursement details for qualified bidders. (*See* R. 14, R. 15.) Neither party has provided the Court with the documents containing the reimbursement amount negotiated with the Intervenors, but counsel for the Parent did disclose during oral argument on June 24, 2010 that the Debtor had entered into expense reimbursement agreements (subject

of course to review by the Notice Parties and the Bankruptcy Court) with the Intervenors on August 5, 2009. At that same hearing, counsel for the Intervenors disclosed that the reimbursement sought was approximately $1,379,000 that they incurred in making a joint bid. The necessity and/or reasonableness of that amount is not the subject of this appeal.

tive expenses that are "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). To qualify as an "actual and necessary cost, ... a claim against the estate must have arisen postpetition and as a result of actions taken by the trustee that benefitted the estate." *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir.2001). Crucial to satisfying the § 503 test is that the estate receive a "discernible benefit" as a result of the expenditure. *Id.* (citing *NL Industries, Inc. v. GHR Energy Corporation*, 940 F.2d 957 (5th Cir.1991)).

Traditionally, the purposes of these two sections are distinct in nature, even though some fee applications could qualify for approval under both standards. Section 363(b), which was introduced in the Bankruptcy Reform Act of 1978, was meant in part to unshackle courts from the more restrictive prior code provisions that provided for the sale of estate assets in very narrow circumstances. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir.1983) (recounting the history behind the development of § 363(b)). At the same time, the Second Circuit in *Lionel* noted that § 363(b) was not intended to go to the other extreme and give bankruptcy courts *carte blanche*. *Id.* at 1069. Ultimately, the *Lionel* court imported the business judgment test as a means of balancing the competing concerns of flexibility—thus allowing debtors to enter into transactions that may enhance the business—with the need for accountability to creditors and equity. *Id.; see also In re Continental,* 780 F.2d at 1226 (citing *Lionel* and applying business judgment test for § 363(b) transactions in the 5th Circuit).

■■■ The award of administrative expenses for "actual and necessary" costs, on the other hand, provides "third parties who lend goods or services necessary to the successful reorganization of the debtor's estate" with priority claims over those of unsecured creditors. *See Jack/Wade Drilling*, 258 F.3d at 387; 11 U.S.C. §§ 503(b)(1)(A), 507(a)(1). The purpose of awarding such expenses (and granting them priority status) is to "permit the debtor's business to operate for the benefit of its prepetition creditors." *Toma Steel Supply, Inc. v. TransAmerican Natural Gas Corp. (In re TransAmerican Natural Gas Corp.)*, 978 F.2d 1409, 1415 (5th Cir. 1992). At the same time, the § 503 "actual and necessary" test is strictly construed so as to keep costs to a minimum. *NL Industries, Inc. v. GHR Energy Corporation*, 940 F.2d 957, 966 (5th Cir.1991). The competing concerns of the administrative expense test are attracting third parties to assist the estate in its reorganization while still preserving the estate.

There being no "white horse" case on which standard should apply in this particular case—expense reimbursement fees for second-round "qualified" bidders in a multiple stage auction for a very unique and very valuable but possibly worthless asset [15]—the Parent and Intervenors have sought to analogize to two other types of fee requests: break-up fees for prospective buyers of a debtor's assets and due diligence fees for potential providers of exit financing. The Parent argues that the administrative expense test should have

---

**15.** If the SCC Judgment was reversed, its value could be zero. The judgment was also for the return of stock and dividends. While the latter was quantifiable, to put a value on the former (even assuming a positive result on appeal) was much more difficult. At least one estimate in the press was that the judgment was worth six billion dollars. *See* Joel Millman, *Judge Awards Asarco 30% of Copper Miner*, Wall Street Journal, April 3, 2009, at B3.

been used, as the Third Circuit applies it in cases involving break-up fees. The Intervenors propose that the business judgment standard was correctly applied, and point to other break-up fee cases in which the business judgment standard was applied. The Intervenors also offer debtor-in-possession (DIP) or exit financing as an analogous case in which bankruptcy courts also apply the business judgment standard.

### 1. Break-up Fees in the Third Circuit and the § 503(b) Administrative Expense Test

The Third Circuit has applied the § 503 administrative expense test in cases involving breakup fees[16] for unsuccessful bidders who sought to purchase substantial estate assets.[17] *See Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527 (3d Cir.1999); *In re Reliant Energy Channelview LP*, 594 F.3d 200 (3d Cir.2010) (following *O'Brien*). In *O'Brien*, Calpine Corporation filed an appeal of a decision "not to award it a break-up fee or expenses in connection with its unsuccessful bid to acquire [the debtor,] O'Brien." 181 F.3d at 529. Calpine had submitted one of the three "highest and best" bid submissions following a multistage sale process. *Id.* O'Brien then had "entered into a binding and guaranteed purchase agreement with Calpine," in which $90 to $100 million of O'Brien's liability would be transferred to Calpine in exchange for its receipt of O'Brien's business. *Id.* The contract conditioned Calpine's obligation to perform "on the parties' ability to secure the approval by the bankruptcy court of a breakup fee of $2 million and expenses up to approximately $2 million to be paid to Calpine under certain circumstances." *Id.* The Bankruptcy Court did not approve the break-up fee or expense provisions due to concerns that approving the fee and expenses would "perhaps chill or at best certainly complicate the competitive bidding process," but did indicate it would be open to permit Calpine to seek the break-up fee and expenses at the end of the process. *Id.* Although Calpine stated then that it would not go forward with the sale process without the break-up fee and expenses, it did participate in subsequent bidding and competed in the auction for the O'Brien, which it ultimately lost. *Id.* at 529–30. Then, before confirmation of the winning bidder's plan, Calpine filed a § 503(b) application seeking a $2 million break-up fee, $2.25 million in expenses, and interest.

Since Calpine had stated that it was seeking approval for the fee and expenses "under the applicable case law setting standards for approval of break-up fees and breakup expenses," and not necessarily under § 503(b), the Third Circuit "consider[ed] whether any provision of the Bankruptcy Code . . . authorizes the award of break-up fees and expenses to an unsuccessful bidder at the plan-based sale of a debtor's assets." *Id.* at 532 (internal citations omitted). It concluded, after considering the "different approaches" taken by multiple bankruptcy courts, that there was no "compelling justification for treating an application for break-up fees and expenses under § 503(b) differently from

---

**16.** Break-up fees are a form of bidding incentive that guarantees a prospective buyer an agreed-to amount of money when certain conditions are met and the transaction is not consummated—the classic example being where the seller enters a binding agreement with another buyer.

**17.** Neither the Parent nor Intervenors have pointed to, nor could this Court find any authority in the Fifth Circuit either citing the Third Circuit's line of cases or discussing any standard that should apply in bankruptcy break-up fee cases.

other applications for administrative expenses under the same provision." *Id.* at 535. As such, it determined that those parties seeking break-up fees would need to "show that the fees were actually necessary to preserve the value of the estate" pursuant to § 503(b) and it rejected application of the business judgment rule. *Id.*

After examining the record evidence, the Third Circuit ultimately affirmed the bankruptcy court's denial of Calpine's application for the break-up fee and expenses because they were not necessary to preserve the value of the debtor's estate in the case. *Id.* at 536. Calpine had participated in the auction even after the break-up fee and expenses were initially rejected by the bankruptcy court, and the bankruptcy court believed that if it had approved the request for the breakup fee and expenses, it would have "chill[ed] or … certainly complicate[d] the competitive bidding process." *Id.* (citing bankruptcy court's opinion). Thus, Calpine's application for breakup fee and expenses failed under the administrative expense test. *See also Reliant,* 594 F.3d at 206–209 (applying *O'Brien* approach to affirm bankruptcy court's rejection of a break-up fee request by failed stalking horse bidder, and reasserting that the business judgment rule should not apply in evaluating the request).

### 2. *Break-up Fees and the Business Judgment Standard*

In contrast, several cases out of the Southern District of New York have applied the business judgment standard when evaluating proposed break-up fees. *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650 (S.D.N.Y.1992); *In re Metaldyne Corp.,* 409 B.R. 661 (Bankr.S.D.N.Y.2009) (following *Integrated Resources* in applying the business judgment rule to evaluate pro-

posed break-up fees); *see also In re Twenver,* 149 B.R. 954 (Bankr.D.Colo.1992) (adopting the *Integrated Resources* approach). In *Integrated Resources,* the district court considered an appeal, filed by a committee of subordinated bond holders, of the bankruptcy court's order approving a break-up fee arrangement between the debtor and a prospective purchaser. 147 B.R. at 653. The prospective purchaser, Bankers Trust, had entered into a non-binding letter agreement with the debtor and two of the three creditors' committees appointed by the bankruptcy court in which Bankers Trust would fund a plan to reorganize the debtor with $565 million in cash, conditioned upon bankruptcy court approval. *Id.* This agreement provided that Bankers Trust would receive an expense reimbursement and a breakup fee should the transaction fail under certain circumstances. The bankruptcy court ultimately approved an amended version of the letter agreement, which reduced the maximum amount that Bankers Trust could recover as a break-up fee, based on its conclusion that the fee was allowed under the business judgment rule. *Id.* at 657–662. On appeal, the district court fashioned a three-question inquiry based on the business judgment rule, which it used to determine whether the break-up fee was permissible, asking:

(1) [I]s the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation;

(2) [D]oes the fee hamper, rather than encourage, bidding; [and]

(3) [I]s the amount of the fee unreasonable to the proposed purchase price?

*Id.* at 657. It ultimately determined that there was no evidence of self-dealing in the negotiation of the letter agreement; that the break-up fee fulfilled three possible useful functions—attracting or retaining a potentially successful bid, establishing a

bid standard, and attracting additional bidders—thereby encouraging bidding; and that the modified break-up fee was about the average percentage in the industry according to expert testimony and reasonable given the complexity of the proposed transaction's structure and subject matter. *Id.* at 657–663. Thus, it affirmed the bankruptcy court's order allowing for the break-up fee. *Id.* at 664.

This three-part test was again used in *Metaldyne,* where the Bankruptcy Court for the Southern District of New York approved an agreement wherein HHI Holdings, LLC was selected by the debtors to be the stalking horse in the auction of its Powertrain assets. 409 B.R. at 670. This agreement which included a proposed break-up fee and expense reimbursement worth less than 3% of the total purchase price, and the bankruptcy court ultimately upheld the bidder protections pursuant to the three-part test, noting that HHI was not an insider; that there was no evidence that the fee would hamper bidding and that the bid actually brought value to the estate by setting a floor on the price; and that the total fee amount fell "within the range of what courts in this jurisdiction have found to be acceptable break-up fees." *Id.* (citing *Integrated Resources* ).

So too, the district court in *Twenver* adopted the *Integrated Resources* approach when it considered a request by plan proponents for a "topping fee" should the debtor's television station be sold to an entity other than the current proposed purchaser. 149 B.R. 954 (D.Colo.1992). There, the district court noted the potential value of break-up and topping fees, which "may encourage a potential purchaser to make an initial bid, which may then be used to attract higher offers." *Id.* at 955 (citing the *Integrated Resources* bankruptcy court's underlying opinion, 135 B.R. 746, 750 (Bankr.S.D.N.Y.1992)). The pro-

posed topping fee of $50,000 in *Twenver,* however, exceeded 10% of the proposed purchase price, and that combined with the plan proponents' request that competing bids must be at least $100,000 higher than the existing bid caused the district court to conclude that such an arrangement would "hamper, rather than enhance, any prospects for a higher bid," was ultimately "not in the best interests of the estate." *Id.* at 956–57. After applying the *Integrated Resources* framework, it rejected the request for approval of the topping fee. *Id.*

The Reimbursement Motion and the Intervenors' Brief also pointed this Court to several additional instances where break-up fees and expense reimbursements were approved. (R. 5 at ¶ 22; Doc. No. 30 at 6.) These cases generally provide little analysis regarding the application of the business judgment standard, but two of them explicitly invoke the business judgment standard. *See In re Loral Space & Commc'ns Ltd.,* Case No. 03–41710(RDD) (Docket No. 154 at 5) (Bankr.S.D.N.Y. Aug. 18, 2003); *In re Exodus Commc'ns, Inc.,* Case No. 01–10539(PJW) (Docket No. 389 at 3) (Bankr.D.Del. Nov. 15, 2001) (finding that the expense reimbursement was both "a proper exercise of the Debtors' business judgment" and a "an actual and necessary cost and expense of preserving the Debtors' estates"). Others invoke § 503, but do not state that § 503 is the only source of authority. *E.g., In re Bethlehem Steel Corp.,* Case No. 01–15288(BRL) (Docket No. 1066) (Bankr. S.D.N.Y. Mar. 27, 2003) (finding break-up payments to be "an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code," without invoking, but not explicitly excluding § 363); *In re Comdisco, Inc.,* Case No. 01–24795(BWB) (Docket No. 289 at 3) (Bankr.N.D.Ill. Aug. 9, 2001). Yet another cites § 363(b) as authority, but make find-

ings pursuant to the administrative expense "actual and necessary" test. *See In re Asia Global Crossing Ltd.*, Case No. 02–15749(SMB) (Docket No.82) (Bankr. S.D.N.Y. Dec. 10, 2002).

### 3. Exit Financing and the Business Judgment Standard

The Intervenor has also sought to analogize to reimbursement for due diligence fees incurred by prospective lenders of debtor-in-possession or exit financing. (Doc. No. 30 at 10.) Such reimbursement, it contends, is not uncommon in the debtor-in-possession financing context where a potential financer's concerns regarding the valuation of a complex asset are similar to those of a potential purchaser of the SCC Judgment. (*Id.* (citing *In re Pilgrim's Pride Corp.*, Case No. 08–45664(DML) (Doc. No. 2996) (Bankr.N.D.Tex. Aug. 11, 2009)) (authorizing payment of expenses related to exit financing pursuant to § 363(b) of the Bankruptcy Code); *In re Spectrum Jungle Labs Corp.*, Case No. 09–50455(RBK) (Docket No. 887) (Bankr. W.D. Tex. June 15, 2009) (similar)).

Earlier in this case, the Bankruptcy Court entered an order authorizing the reimbursement of such fees. (Doc. No. 30 at 10; R. 28.) The Debtor had based its motion on the business judgment standard, arguing that it had a legitimate need to pay due diligence fees in order to entice potential lenders to commit the resources necessary to develop loan terms. (R. 27.) Further, the Debtor sought approval under the deferential business judgment standard because "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." (R. 27 at 5 (citing *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985)).)

### B. The Bankruptcy Court Applied the Correct Legal Standard

■ This Court declines to adopt the administrative expense standard in this case for several reasons. First, the Court disagrees that the administrative expense standard is the only applicable test in this case. Second, this simply was not an application for administrative expenses, and the Reimbursement Motion is not the typical request for an administrative fee as that concept is typically applied in Bankruptcy cases. (While this Court finds neither analogy—break-up fees and post-petition financing—to be a proper fit, the latter is clearly closer.) Third, the modified business judgment test seems most applicable given factual context of the Debtor's proposal.

Although the Parent has treated the standard as an "either/or" issue, the Court does not find that the *O'Brien* reasoning is applicable in this case. Earlier in this case, the Debtor sought, and Bankruptcy Court granted, the Reimbursement Motion. Thus, *before* the Intervenors here incurred the due diligence and work fees at issue, they did so with the blessing of the Bankruptcy Court. In contrast, the failed bidder in *O'Brien* not only failed to obtain a similar such order approving its proposed break-up fee arrangement, but in fact had its motion for same denied. Having incurred expenses without pre-approval for reimbursement, it had to later seek relief in the form of an administrative expense. Thus, the *O'Brien* court was presented with the issue of whether it could apply the less rigorous business judgment standard in post-bidding administrative expense requests for break-up fees, and it concluded that it could discern no reason why break-up fee requests should be given

more lenience than other administrative expense requests. Nowhere does *O'Brien* mandate that the administrative expense standard should apply in cases where the bankruptcy court authorizes a debtor in possession to enter into a reimbursement agreement with a potential buyer. *See United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, Civ. No. 02–02854, 2003 WL 21738964, at *9–*10 (S.D.N.Y. July 28, 2003) (noting the distinction, and commenting that while "*O'Brien* may be correct that the only way an unsuccessful bidder can itself seek payment of a break-up fee and expenses from the estate is under 503(b) ... I think the better view is that pursuant to § 363(b), a bankruptcy court may authorize a debtor in possession to enter into a reimbursement agreement with a potential buyer.").

■■■ The *Bethlehem Steel* court considered the temporal distinctions between sections 363(b) and 503 of the Bankruptcy Code, and noted that they "serve different purposes in bankruptcy proceedings." *Id.* at *10. Section 363 is meant to "govern[ ] the use of funds by the debtor in possession *while it operates its business* after the bankruptcy petition is filed.... [U]nder § 363(b), if the debtor in possession wants to use funds from the estate for a transaction outside the ordinary course of business, the debtor must obtain advance approval from the bankruptcy court." *Id.* On the other hand, § 503 "allows entities that *incurred* certain expenses to request payment from the estate." *Id.* That is, § 503 applications generally can only be considered once the expenses have been incurred. As counsel for the Intervenors aptly summarized in oral argument, the difference is in asking for permission versus asking forgiveness. Where a debtor seeks permission, "[t]he authorization of certain types of payments under § 363(b) is not prohibited simply because there is another section of the Bankruptcy Code related to the same type of payment." *Id.* at *11. *Cf. Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22 (S.D.N.Y. 2005) (relying on *Bethlehem Steel* to affirm Bankruptcy Court's order approving retention of law firm to represent debtors' employees based on the business judgment standard, and rejecting the argument that § 327(e) of the Bankruptcy Code, which deals with legal fees, was the exclusive authority under which the retention agreement could be approved).

Thus, in *Bethlehem Steel*, the district court affirmed the bankruptcy court's order allowing for the reimbursement of union expenses, sought by the debtor under § 363(b), for the purpose of ensuring that the union could meaningfully participate in developing a reorganization of the business. *Id.* at *10–12. In affirming the bankruptcy court's order, the district court found that the business judgment standard under § 363(b) was the appropriate legal test, and that the bankruptcy court had not erred in finding that making such payments for union expenses was in the debtor's business interest. *Id.* This Court also declines to find that the § 503 test was the only appropriate legal test, where the Debtor sought and was granted permission under § 363(b) to make the Expense Reimbursement.

Moreover, this is simply not the type of proceeding typically governed by the administrative expense standard.[18] Tradi-

---

18. Beyond the fact that it was not filed as an administrative expense request, the Court finds it noteworthy that the question on everyone's (including the Parent's) mind at the time that the Bankruptcy Court considered the Reimbursement Motion was whether or not it made any business sense. Although there were occasional passing references to

tionally, administrative expenses are for routine operational costs: for example, those from vendors who continue to engage with the debtor despite its status in bankruptcy proceedings, or, as § 503(b)(1)(A)(i) sets out, wages of employees whose continued performance is critical to allowing a debtor to maintain operation of its business or to wind up its estate. *See In re TransAmerican Natural Gas Corp.*, 978 F.2d 1409 (finding that a bankruptcy court had correctly granted an administrative expense claim for vendor's supply of casing to debtor, even though some of the casing was defective); 11 U.S.C. § 503(b)(1)(A)(i). *See also* 3 William L. Norton, Jr., *Norton Bankruptcy Law & Practice* § 49:15 (3d ed. 2008) (describing the rationale for allowing administrative claims—"realization of the full benefit" of bankruptcy proceedings by inducing third parties to do business with

the estate or participate in the proceedings—and classifying the types of administrative claims typically available under two headings: "(1) operating and preservation expenses; and (2) compensation and reimbursement for parties who help the bankruptcy process to function.") [19]

Here, the Debtor's request for approval of expenses pursuant to the business judgment standard was anything but routine. The SCC Judgment itself was highly unique, but a successful sale of the judgment had tremendous upside. If the Debtor had been able to sell the SCC Judgment for even half of its estimated worth, it would have had more than sufficient funds to pay all creditors with certain cash on the closing date of its confirmation plan. Like other cases in which courts have applied the § 363(b) business judgment standard to evaluate unorthodox proposed transactions, this was a potentially

the term "administrative expense," it was never raised in the context of applying the actual administrative expense standard. In fact, the Parent's chief argument at the time was that paying "mere shoppers" was a waste of money. The Court could not find any argument by the Parent to the effect that the administrative expense standard was the only appropriate standard in the transcripts of hearings on the Reimbursement Motion before the Bankruptcy Court. (*See* R. 11, 13, 17.) The Court was also unable to find any mention of the administrative expense standard in the Parent's objections to the Reimbursement Motion and the Seal Motion. (*See* R. 7, 8.) Nor did the Parent raise the administrative expense argument in either of its motions for stays pending appeal in the Bankruptcy Court or this Court. (*See* R. 19; Doc. No. 6.) Even the Parent's designation of issues for appeal, which listed nine separate issues, never once mentioned the administrative expense standard. (Doc. No. 3–2 at 1–2.) Up until its opening brief in the appeal, the Parent's chief arguments against the Reimbursement Order were that it was unprecedented and not pursuant to a legitimate business purpose. (*See, e.g.*, R. 7 at 3; R. 19 at 7–8.)

**19.** Some classic examples of the first heading are: "rent; wages and other employee compensation; and ... other operating and preservation expenses, such as insurance premiums, utilities, and trade credit. Contracts that the estate assumes or enters into become an administrative obligation. Expenses incidental to normal business operations are also allowable; these may even include tort claims and environmental claims. Taxing authorities are also entitled to administrative status for all post-petition taxes and for associated fines and penalties." *Id.* (internal citations omitted).

Some classic examples of the second heading include: "Code § 330 professional compensation and reimbursement to a trustee, examiner, or professional employed under Code § 327 or Code § 1103; reimbursement of the expenses of creditors or others who do something special in reference to the case [citing examples such as a creditor that recovers hidden assets and a creditor that prosecutes a criminal offense related to the case]; ... compensation for an indenture trustee that makes a substantial contribution to a reorganization case; U.S. Trustee quarterly fees; and witness fees and mileage." *Id.* (internal citations omitted).

risky but worthwhile investment.[20] *See, e.g., In re Continental,* 780 F.2d 1223 (approving debtor's proposal to use estate funds to enter into and satisfy lease obligations under leases not contemplated in 11 U.S.C. § 365 for two aircraft); *In re Chrysler LLC,* 405 B.R. 84 (Bankr. S.D.N.Y. May 31, 2009) (approving under § 363(b) debtor's proposal to sell assets to a new corporate entity owned partly by the federal government). Furthermore, even the fact that the auction process stirred interest in the marketplace for the SCC Judgment had the beneficial effect of motivating the two competing companies that were offering plans of reorganization. Thus, given that the Debtor's unique proposed transaction in this case demanded some flexibility but still provided for oversight by interested parties, it seems more like the type of transaction anticipated by § 363(b) than a routine administrative expense under § 503.

Finally, the Court finds that given the factual context of the Reimbursement Motion, the business judgment standard was the correct legal standard. The Debtor sought to auction the SCC Judgment in order to satisfy the preferences of creditors for cash, as opposed to shares in a litigation trust, upon confirmation. The major beneficiaries of the proposed trusts were creditors outside of the copper industry who would have little objective evidence to evaluate if what the estate was offering had any value at all. Further, a successful sale of the asset could have certainly benefitted the estate, providing creditors with the amounts of money owed to them sooner rather than later.

Several potential bidders for the SCC Judgment, however, had expressed concern regarding the complexity of the asset,

and many had requested reimbursement for the due diligence that would be necessary for them to consider how and if they would be able to make their bids. Providing reimbursement for their due diligence would reduce the costs involved in making their bids, and could attract additional bidders that otherwise would be deterred by the uniqueness of the asset. Time was certainly of the essence because the Debtor faced with the competing plans and the demands of the fast-approaching confirmation trial. In addition, the Bankruptcy Court considered that the auction would aid in ascertaining the value of the estate, which would in turn aid the Bankruptcy Court itself in assessing the competing proposed plans of reorganization. All of these facts indicate that it was appropriate for the Bankruptcy Court to defer to the Debtor's business judgment in deciding the Reimbursement Motion.

Thus, given that the Debtor sought approval of the Reimbursement Motion prior to the relevant part of the sale process, that this was not the kind of transaction typically authorized by administrative expense provisions of the Bankruptcy Code, and that the urgencies of the reorganization process called for swift action, the Court finds that the § 363(b) business judgment standard was the appropriate legal standard in this case.

### C. The Bankruptcy Court Did Not Err in Concluding that the Reimbursement Motion Satisfied the Business Judgment Standard.

 Under the three-question inquiry proposed by the *Integrated Resources* court, this Court finds that the Bankruptcy Court did not err in granting the Reim-

---

**20.** In the words of Debtor's counsel at the time, "you've got to spend money to make money." (R. 17 at 20:9.)

bursement Motion. *See In re Integrated Resources*, 147 B.R. at 657. First, there is no record ·evidence of any self-dealing or manipulation among the parties who negotiated the reimbursement procedures. The Debtor had obtained either no objection with deference to the Debtor's business judgment or approval by the major creditor committees—the Official Committee of Unsecured Creditors, the Official Committee of Asbestos Claimants, the Future Claims Representative, and the Department of Justice, Environmental and Natural Resources Division. (R. 14 at ¶ 2.) The only objection to the process came from the entity that might have to eventually pay the judgment or deal with an outside entity that might eventually own the judgment. Ultimately, the Reimbursement Order also required that each of the Notice Parties, which includes the aforementioned creditor committees along with the United States Trustee, and the Bankruptcy Court be apprised of any negotiated reimbursement payment amounts before the Debtor could make the payments. (R. 15 at ¶ 3.) The Notice Parties each had 24 hours upon notice of any proposed payment to object, and thereby invoke an expedited hearing setting on the proposed payment, and the Bankruptcy Court had *sua sponte* authority to set such a hearing. (*Id.* at ¶¶ 5–7.) Thus, there were ample checks to prevent abuse of the Debtor's resources.

Second, the Intervenors' actions, and the requests of several other bidders, demonstrate that the Reimbursement Order facilitated the auction process, even if no sale was ultimately made. Perhaps the best evidence that the Reimbursement Order was beneficial is that the Intervenors in fact relied upon it when they opted to pursue additional due diligence that allowed them to make a binding bid offer after they had completed their due diligence. The Court disagrees that the Reimbursement Order was a payment for "mere shoppers," as the Qualified Bidders had all previously submitted non-binding offers that were serious enough to warrant being invited to proceed by the Debtor. There is no record evidence that the expense reimbursements in any way hampered the auction process. To the contrary it enhanced it. It is also worth noting that both the Bankruptcy Court and this Court found that the auction results had indeed been helpful in the confirmation process because it had provided the Parent and Sterlite with an incentive to propose full payment plans that would ensure all creditors would be paid what they were owed.[21] In this respect, the process ultimately benefitted the Parent.

Finally, the Court finds that the approved maximum available size of the fee[22] was certainly reasonable in comparison to the size of the SCC Judgment, especially when one considers the complexity of the asset. The maximum amount of expenses that could be reimbursed under the Reimbursement Order was less than one per-

---

21. (*See* Supplemental R. 29 at ¶ 57 (Bankruptcy Court's Report and Recommendation) ("Initiation of the auction process brought tangible benefit to the Debtor's estate and was perhaps the final impetus needed to encourage the Parent to file its plan which pays creditors in full.").) This finding, which was not objected to by the Parent, was adopted by this Court's Memorandum Opinion, Order of Confirmation, and Injunction without any further discussion. (Supplemental R. 30 at 8.)

22. This maximum possible amount to be made available in the proposed Reimbursement Fund was disclosed to the Notice Parties, the Parent, and the Bankruptcy Court under seal and is contained in the record. (R. 12 at Ex. C; R. 16.) Only the bidders were not given access to the total amount that would be available in the Reimbursement Fund.

cent of the cash part of the SCC Judgment. (*See* R. 15 at ¶ 2; R. 5 at ¶¶ 13–14; R. 12 at Ex. C.) Thus, the numbers contemplated by Reimbursement Order would certainly not make or break the ability of the Debtor to emerge successfully from bankruptcy.[23]

The Bankruptcy Court determined that the Reimbursement Motion was "fair, reasonable, and appropriate" and that it was "designed to maximize the value of ASARCO's estate." (R. 15 at ¶ C.) It further found that "ASARCO ha[d] demonstrated a compelling and sound business justification for the Expense Reimbursement under the circumstances, timing, and procedures set forth in the [Reimbursement] Motion." (*Id.*) This Court cannot find that these conclusions were in error.[24]

## IV. Conclusion

Having considered the competing legal standards proposed by the Parent and Intervenors, and having found that the Bankruptcy Court correctly applied the business judgment standard and did not err in finding that the Debtor had satisfied the business judgment standard, the Court therefore AFFIRMS the Reimbursement Order.

23. By this statement, the Court is not approving the amount or reasonableness of the Intervenors' fee in advance. That issue not before this Court and will ultimately be decided by the Bankruptcy Court. This Court is merely affirming the Reimbursement Order, which authorized the process allowing for payments of this kind of fee.

24. Since this Court has determined that the Bankruptcy Court applied the correct legal standard and did not err in concluding that the Debtor had satisfied the § 363(b) standard, it need not decide the issues of whether the Reimbursement Motion satisfied the § 503 test or whether this appeal is equitably moot.